IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JACQUELYNN OLIVER, | ) | Case No. 4:25-cv-00841-BYP |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Jacquelynn Oliver ("Oliver"), seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for supplemental security income ("SSI") under Title XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") failed to reach a conclusion supported by substantial evidence, I recommend that the Commissioner's final decision denying Oliver's application for SSI be vacated and that Oliver's case be remanded for further consideration.

## II.      Procedural History

Oliver filed for SSI on March 29, 2019, alleging a disability onset date of January 15, 2016. (Tr. 172-77). The claims were denied initially and on reconsideration. (Tr. 61, 81). She then requested a hearing before an ALJ. (Tr. 120). Oliver, represented by counsel, and a vocational expert ("VE") testified before the ALJ on April 24, 2020. (Tr. 28-60). On July 15,

2020, the ALJ issued a written decision finding Oliver not disabled. (Tr. 9-23). The Appeals Council denied her request for review on January 12, 2021. (Tr. 1-3).

The matter was appealed to the District Court, and, after a stipulated remand, was returned to the Agency on September 17, 2022, for further decision. (Tr. 1058-60). New hearings before the ALJ were held on April 18, 2023, and September 7, 2023. (Tr. 999-1055). The ALJ issued a second written decision on October 23, 2023, finding Oliver not disabled, making the second hearing decision the final decision of the Commissioner. (Tr. 972-90; see 20 C.F.R. §§ 404.984, 416.483). The Appeals Council issued a Declinations of Exceptions of Final Decisions on February 26, 2025. (Tr. 962-66). Oliver timely filed this action on April 28, 2025. (ECF Doc. 1).

## III.  Evidence

### A.  Personal, Educational, and Vocational Evidence

Oliver was 43 years old when she filed her application, making her a younger individual according to Agency regulations. (*See* Tr. 989). She graduated from high school. (*See id.*). In the past, she worked as a certified nursing assistant, DOT 355.674-014, medium performed at medium and heavy, SVP 4, semi-skilled. (Tr. 1025).

### B.  Relevant Medical Evidence

Oliver presented to the emergency department ("ED") on January 16, 2018 with a primary complaint of a migraine with associated nausea, photophobia, retching, and belching that began three days prior. (Tr. 865). The migraine was consistent, moderate in severity, and worsened with light. (*Id.*). At the ED, Oliver reported that she visited her primary care physician the same day to receive shots of Phenergan and Imitrex with no resolve. (*Id.*). Examination notes state that Oliver was retching upon examination and was unable to complete an eye exam due to

photophobia. (Tr. 868). After receiving IV fluids, Zofran, Benadryl, morphine, and Toradol, Oliver reported that she was improving and that her pain had reduced from a nine to a seven. (Tr. 868-69). A CT was performed with the following findings reported: "ventricular and cisternal spaces are normal in size, shape and configuration for a patient of this age. No dominant mass, midline shift, hydrocephalus, extra-axial fluid collection or acute hemorrhage. No acute sinus disease, skull is intact. Intraorbital contents are unremarkable." (Tr. 874).

While admitted to the ED, Oliver had a neurological consultation with Robert J. Brocker, Jr., M.D., for persistent migraine on January 17, 2018. (Tr. 878). Dr. Brocker diagnosed Oliver with persistent migraine headache and status migrainosus. (*Id.*). She was prescribed Imitrex, Voltaren, and Zofran for treatment of migraines and topiramate to prevent the migraine. (*Id.*). Oliver was discharged from the ED on January 17, 2028. (Tr. 885).

Oliver presented for a follow-up appointment with Dr. Brockner on February 2, 2018. (Tr. 368-87). Oliver reported that she has experienced migraines for years, but they have increased as of late, and that she experiences six to seven per week and last 24 to 48 hours. (Tr. 387). The severity and length of the migraine varies. (*Id.*). She also experiences nausea, vertigo, and light flashes in her vision, and has hallucinations that her nose is bleeding. (*Id.*). On the left side the migraines are located under her cheekbone, on the right side they are in the temporal, jaw, and ear area. (*Id.*). She described the pain as sharp and digging. (*Id.*). She rated the pain between six to ten on a ten-point scale. (*Id.*). Her migraines are alleviated with sleep and medication and aggravated by bright light, loud noise, emotional stress, exposure to cold air, and activity. (*Id.*). Dr. Brocker diagnosed Oliver with chronic migraine without aura with status migraniosus, not intractable and chronic daily headache. (Tr. 389). They discussed conservative treatment options including medications, physical therapy, epidural blocks, trigger point

injections, and behavioral modifications. (*Id.*). Oliver was prescribed Imitrex, Topamax, Cataflam, and prenate mini and instructed to watch for changes in her headaches. (Tr. 390).

Oliver presented to an appointment with Dr. Brocker on March 6, 2018, with a chief complaint of migraines four to five times per week that last between 12 and 18 hours. (Tr. 384). Dr. Brocker reviewed a February 20, 2018 MRI and noted that the results were normal. (Tr. 385). Oliver's Topamax prescription was increased. (*Id.*). She was also prescribed a Medrol Pak to break the cycle of the migraines. (*Id.*).

At an April 10, 2018 follow up with Dr. Brocker, Oliver reported that she was still experiencing four migraines per week. (Tr. 383). Oliver reported that she runs out of Imitrex, leading Dr. Brocker to add Maxalt 10 mg as needed. (*Id.*). Dr. Brocker noted that he knew the Topamax was helping because Oliver reported worse headaches when she missed taking it and increased the dosage. (*Id.*). Dr. Brocker also discussed the benefits of smoking cessation. (*Id.*).

On May 22, 2018, Oliver reported to Dr. Brocker that her last migraine lasted five to six days and the cycle was unbroken by the Medrol Dosepak. (Tr. 380). Dr. Brocker increased Topamax and prescribed Inderal LA 60 mg once daily in an attempt to prevent migraines. (*Id.*). He also instructed that she could present to an ED for a shot and state that he sent her. (*Id.*). Oliver informed Dr. Brocker that she was going to seek a second opinion in Pittsburgh. (*Id.*).

Oliver presented to a September 10, 2018 follow up appointment with Dr. Brocker reporting that she had been experiencing a migraine for the last three days. (Tr. 376). She reported having significant migraines and if she did not take a steroid every week they become devastating. (Tr. 377). Dr. Brocker noted that her MRI looked normal and "just showed small vessel disease." (*Id.*). He continued her medication regimen accordingly: "Topamax 5 at night, Diclofenac 3 times a day for early headaches, Prenatal vitamins daily, Inderal daily and Imitrex

4

or Maxalt for a bad one." (*Id.*). Br. Brocker noted that Botox would be the next approach and referred her to Dr. Duran and the migraine center. (*Id.*).

During a pain management initial evaluation on January 28, 2019, Oliver reported occasional headaches and severe facial pain to Joseph Williams, D.O. (Tr. 584).

On February 22, 2019, Oliver presented for a follow up appointment with Jose Cassanova, M.D. (Tr. 688). Her primary diagnosis was chronic migraine without aura. (*Id.*). She presented for a second Botox injection, reporting 80 percent relief and improvement upon the last injection. (*Id.*). She denied having any side effects or ED visits. (*Id.*). Oliver presented for further Botox injections on May 24, 2019, August 16, 2019, November 8, 2019, June 10, 2020, September 21, 2020[1], December 16, 2020, March 18, 2021, June 16, 2021, September 10, 2021, February 11, 2022[2], May 7, 2022, July 29, 2022, October 28, 2022, January 20, 2023, and April 21, 2023. (Tr. 689, 699, 700, 1504, 1522, 1530, 1536, 1544, 1552, 1559, 1565, 1966, 1974, 1978-79, 1982).

At her August 16, 2019 appointment, Oliver asked to try another rescue medication for migraines lasting longer than a few days; she was given Medrol Dosepak and told they could try Imitrex injections if no relief occurs from Imitrex 100mg. (Tr. 700). On November 21, 2019, Dr. Cassanova noted that Oliver's migraines appeared partially controlled with Botox injections. (Tr. 693).

Oliver presented for an appointment with Dr. Cassanova on August 22, 2020. (Tr. 1510). Dr. Cassanova noted that Oliver had been hospitalized three weeks prior for due to an acute dysarthria episode with numbness of the left face, arm, and leg. (*Id.*). The episode lasted several

---

[1] Oliver noted migraine improved 70 percent with Botox at this appointment. (Tr. 1523).
[2] Oliver reported that she had started taking Ubrelvy for acute treatment of migraines with good results during this encounter. (Tr. 1559).

hours and then improved. (*Id.*). She underwent an MRI, MRA, and CTA; all of which were unremarkable. She was discharged home and instructed to discontinue Imitrex. (*Id.*). Oliver's present symptoms of right mandibular and zygomatic pain were attributed to her secondary diagnosis of trigeminal neuralgia. (Tr. 1511). Dr. Cassanova discontinued Gabapentin for trigeminal neuralgia and replaced it with Trileptal 150 mg twice daily to increase by 150 mg per week for five weeks. (Tr. 1516). Imitrex was discontinued and replaced by Nurtec 75 mg at headache onset. (*Id.*).

During a December 16, 2020 appointment for Botox injection, Oliver reported 60 percent improvement in duration and severity post injection, however she still experienced daily headaches. (Tr. 1530). Dr. Cassanova prescribed Vyepti infusion to see if that improved her headaches. (*Id.*). She further reported Tramadol no longer being effective at her March 18, 2021 encounter. (Tr. 1537). Dr. Cassanova discontinued Tramadol and started Oliver on Nucynta 100 mg three to four times per day. (Tr. 1537). On January 20, 2023, Oliver reported daily headaches despite treating with Ubrelvy and Botox injections. (Tr. 1979). Dr. Cassanova prescribed Tramadol for a three-month trial. (*Id.*).

On September 29, 2021, Oliver presented to the ED with complaints of a four-day headache and other symptoms that were found "somewhat consistent with COVID-19." (Tr. 1461, 1463). She was tested and discharged home to await results. (Tr. 1463).

### C.    Medical Opinion Evidence

Oliver presented for consultative examination with Andrea VanEastentberg, Ph.D., on May 2, 2019. (Tr. 680). Oliver reported to Dr. VanEasternberg that, among other things, she was applying for social security benefits due to her migraines. (*Id.*). She stated that she had a migraine during the exam. (*Id.*). Oliver explained that she felt "a little more functional" with the

6

Botox treatment. (Tr. 682). In explaining her activities of daily living, she stated that she typically takes migraine medication after taking her daughters to school and then lays down and takes a hot shower. (*Id.*). According to Dr. VanEastenberg's assessment, Oliver was not limited in understanding, remembering, and carrying out instructions; or maintaining attention, concentration, persistence, and pace for simple or multi step tasks. (Tr. 685). Oliver would have no limitations in responding appropriately to work pressures in a work setting with simplistic, repetitive tasks, in an isolated setting. (*Id.*). Further, she made an unremarkable social presentation for the purposes of determining her limitation in responding appropriately to supervision and to coworkers in a work setting. (*Id.*).

On June 6, 2019, state agency reviewing physician Anne Prosperi, D.O., found that Oliver did not meet or equal any Listings and could perform light work with the following limitations: she could frequently use hand controls bilaterally; never climb ladders, ropes, or scaffolds; frequently climb ramps or stairs, stoop, kneel, and crouch; occasionally crawl; frequently engage in fine and gross hand manipulation bilaterally; and should avoid all exposure to hazards, such as unprotected heights or dangerous machinery. (Tr. 70-76). State agency reviewing physician Elaine M. Lewis, M.D., affirmed Dr. Prosperi's opinion on reconsideration. (Tr. 90-94).

Dr. Cassanova provided a medical opinion dated April 17, 2020. (Tr. 702). In this opinion, Dr. Cassanova noted that he had been treating Oliver for one year for chronic migraines and that she was "only limited when she has a severe migraine." (*Id.*).

Jason Lin, M.D., completed a Medical Statement of Ability to Do Work-Related Activities on December 3, 2022. (Tr. 1612-21). In his opinion, Oliver did not meet or medically equal Listings 11.08 or 11.14. (Tr. 1619-20).

Susan W. Lee, D.O. completed a medical interrogatory at the request of the ALJ regarding Oliver's migraines in May 2023. (Tr. 1984-89). According to Dr. Lee, Oliver had the following impairments: chronic migraine, neck pain due to degenerative disc disease, knee pain due to osteoarthritis, and fibromyalgia. (Tr. 1986). Dr. Lee found that Oliver's impairments did not meet or medically equal Listing 11.02, stating:

> The claimant has a diagnosis of chronic migraine. As there is no specific SSA Listing for migraine, according to Policy Interpretation Ruling SSR 19-4p, I have used Listing 11.02B and D for Epilepsy as a guideline. Per these guidelines, the claimant does not equal the Listing. She has had normal physical examinations, without significant physical limitations noted (5F4; 14F; 17F169-170; 27F3; 28F19). She was noted to have significant improvement in migraine headaches, which were reported to be controlled through the end of 2020 (3F; 13F; 14F; 22F). It is noted that headaches increased in frequency beginning in early 2021. Per the most recent Neurology notes in 2022, headaches were noted to be frequent, but no exact frequency was reported. Furthermore, while the pain from migraine headaches may contribute to some degree of physical impairment, she does not have associated marked mental impairment required to equal Listing 11.02D. She had a mental status evaluation performed 5/2/2019, in which no significant mental limitations were noted. She was found to be "functioning within the average range of adult intellectual ability." It was also noted that the claimant's "level of cognitive functioning is not expected to cause difficulties with her abilities to understand and follow basic directives and routines." (12F)[.]

(Tr. 1987).

### D.    Administrative Hearing Evidence

Upon remand, the ALJ held two hearings: one on April 18, 2023 (Tr. 1040-55) and another on September 7, 2023 (Tr. 1001-37).

#### 1.    April 18, 2023 Hearing

At the outset, the ALJ noted that he asked a medical expert ("ME") to examine whether Oliver's migraines met or equaled Listing 11.02, but the ME considered Listings 11.08 (spinal cord disorders) and 11.14 (peripheral neuropathy). (Tr. 1048). The hearing was postponed to obtain an ME opinion specific to Listing 11.02. (Tr. 1054).

2.        **September 7, 2023 Hearing[3]**

At the time of the hearing, Oliver lived with her two daughters, aged 11 and 13 (Tr. 1009). She can drive her daughters to school, unless she has a migraine. (Tr. 1009-10). Oliver stated that she cannot do anything when she has a migraine. (Tr. 1009). Oliver explained that her daughters help her a lot around the house when she is not feeling well and had been doing so since they were five years old. (Tr. 1010). Her daughters help with cooking, cleaning, and laundry. (*Id.*). Sometimes, she cannot make it up the stairs without the assistance of both of her daughters. (*Id.*). Oliver's friend occasionally assists with grocery shopping, but shopping is typically done by her and her daughters. (Tr. 1011).

Oliver completed some college and received vocational certifications for medical coding and nursing assistance. (Tr. 1011). She started esthetician training, but did not complete it. (*Id.*).

Oliver had not worked since 2012. (Tr. 1011). At that time, Oliver worked as a licensed nurse's aide. (*Id.*). Her day-to-day job duties included taking temperatures, drawing blood, charting, and helping patients use the restroom. (Tr. 1012). She explained that this job required more pushing and pulling than lifting, but that with the assistance of others or a Hoyer lift, the heaviest thing she would have to lift is a 300-pound patient. (*Id.*).

Regarding her medical conditions, Oliver felt as though they were the same or worse since her previous hearing. (Tr. 1013). She has eczema on her hands that causes blisters. (*Id.*). Her hands get very itchy, burn, stink, and are painful. (*Id.*). Her doctor's recommended a special soap to wash her hands, forgo washing as much as possible, no cleaning with water, two or three creams, and an injectable to treat the eczema. (*Id.*). Besides eczema, she is prevented from

---

[3] The ME did not testify during the hearing, but two MEs provided written responses to interrogatories in advance of the hearing. The ALJ explained that he determined the written response of the second ME to be sufficient and declined to obtained a third ME for the hearing. Upon this explanation, Oliver's attorney did not object to proceeding in the hearing without an ME present. (Tr. 1005).

working due to her migraines, trigeminal neuralgia, back pain from a nurse's aide injury, and her knees. (Tr. 1014). In a typical month, Oliver has 10 to 15 migraines but specified that they do not necessarily always last the whole day. (Tr. 1010). Her migraines and trigeminal neuralgia seem to trigger each other. (Tr. 1014).

Oliver explained that she does not have trouble getting a job, rather she has trouble keeping a job. (*Id.*). If she has an episode at work with her migraines and trigeminal neuralgia, she is unable to perform her duties and cannot drive herself home. (*Id.*). When she has an episode, she needs to be in a dark room, with a cool rag on her head, and to take Ubrelvy to calm the migraine. (*Id.*). She also requires the room to be quiet, explaining that she does not know if the noise extends the migraine or just makes it more excruciating. (Tr. 1018). But this does not calm the trigeminal neuralgia which causes pain in her head, face, under her eye sockets, into her jaw. (*Id.*). After a migraine, she experiences brain fog but is able to resume regular activities. (Tr. 1018).

Oliver has experienced migraines since childhood, but they worsened as an adult. (Tr. 1015). She started to receive Botox treatments, which she found to be effective, although they did not completely resolve her migraines. (*Id.*). Before Botox, a migraine could last a week and require her to crawl around her house, be dizzy, and have blurred vision. (*Id.*). Since Botox, she still experiences the same symptoms, but less intense and not for as long. (*Id.*). For example, before Botox the migraines typically lasted 24 hours, after Botox they last approximately four hours. (*Id.*). Ubrelvy also helped shorten the migraine from about six or eight hours to four. (Tr. 1017). However, she still experiences pain, light and sound sensitivity, describing her pain as a pounding or drilling sensation. (Tr. 1016). Her last injection was in July, and she estimated she

had 25 migraines between the injection and the date of the hearing, normally experiencing them twice a week. (Tr. 1015).

Oliver explained that 30 to 40 percent of her migraines present in conjunction with trigeminal neuralgia symptoms. (Tr. 1019). However, she also experiences trigeminal neuralgia symptoms alone approximately once or twice a week. (*Id.*). She has taken Gabapentin, Trileptal, and Tramadol to alleviate her trigeminal neuralgia symptoms. (*Id.*).

She also has pain in both of her knees. (*Id.*). Surgery on her left knee was scheduled but the week of the surgery she fell and hurt her right knee, and doctors explained that her right knee was inoperable and would continue to deteriorate. (Tr. 1019-20). Additionally, Oliver has carpal tunnel syndrome. (Tr. 1020). As a result of carpal tunnel, she has had to switch her and her daughters' hair styles to cut down on maintenance. (Tr. 1020).  She experiences weakness, tingling, and numbness in her hands. (*Id.*). Oliver also suffers from pinching and stabbing pain in her right shoulder which travels down the back of her arm to her elbow. (*Id.*).

As a result of her impairments, Oliver believes that she cannot lift or carry more than ten pounds. (Tr. 1021). She can grab things off of grocery store shelves to place them in her basket, but carrying bags or a case of water would be "impossible." (*Id.*). She can stand for less than an hour and sit for no more than two hours due to her low back pain. (*Id.*). Her pain requires her to constantly shift and move. (*Id.*). Oliver has treated for the rash on her hands for over a year and has treated neck pain through physical therapy. (*Id.*). However, her insurance only allows a limited number of physical therapy sessions. (Tr. 1022). The physical therapy helps her neck pain but does not stop it. (*Id.*).

Next the VE testified. According to the VE, Oliver's past work included CNA, DOT 355.674-014, generally performed at medium, but actually performed at both medium and heavy, SVP 4, semi-skilled. (Tr. 1025).

The ALJ posed a hypothetical person of Oliver's age, education, and job history who were limited to working light exertion jobs who could frequently push and pull with the bilateral upper extremities; frequently operate foot controls with the bilateral lower extremities; never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs; occasionally stoop, kneel, crouch, and crawl; frequently balance; frequently reach, handle, and finger with the bilateral upper extremities; limited to very quiet or moderate noise intensity work settings; no more than occasional exposure to extreme cold, vibrations, and bright lights – bright lights being defined as brighter than a typical office setting; avoiding all exposure to hazards such as unprotected heights, dangerous moving mechanical parts, and commercial driving; performing simple, routine, or repetitive tasks and not able to perform tasks that require a high production rate pace – such as assembly line work; occasional interaction with supervisors and coworkers in a non-public work setting, but limited to superficial contact – meaning no group, tandem, or collaborative tasks as well as no management, direction, or persuasion of others; who could respond appropriately to occasional changes in the routine work setting that were easily explained and/or demonstrated in advance of gradual implementation. (Tr. 1025-26).

According to the VE, this hypothetical individual could not perform Oliver's past work, but could perform the light, unskilled jobs of merchandise marker, DOT 209.587-034, SVP 2, with approximately 136,000 jobs in the national economy; mail sorter DOT 222.687-022, SVP 2, with approximately 117,000 jobs in the national economy; and routing clerk, DOT 222.587-0385, SVP 2, with approximately 25,000 jobs in the national economy. (Tr. 1027).

If the first hypothetical individual were still limited to light work but was further limited to standing or walking five hours in an eight-hour workday, that individual could perform all of the work previously described, but the number of jobs would be reduced. (*Id.*). For example, the merchandise marker would be reduced to approximately 45,000 jobs in the national economy; the mail sorter would be reduced to approximately 58,000 jobs in the national economy; and the routing clerk would be reduced to approximately 12,000 jobs in the national economy. (Tr. 1027-28).

If the second hypothetical person were further limited to standing and/or walking for four hours of an eight-hour workday, this would have no impact on the jobs listed for the second hypothetical individual. (Tr. 1028). If the hypothetical individual were limited to standing and/or walking for two to three hours in an eight-hour workday, this person would be limited to sedentary work. (*Id.*).

If a fourth hypothetical individual, with the same limitations as hypothetical individual one, but was further limited to sedentary work, that individual could perform the jobs of addresser, DOT 209.587-010, SVP 2, unskilled, with approximately 2,000 jobs in the national economy; document preparer, DOT 249.587-018, SVP 2, unskilled, with approximately 15,000 jobs in the national economy; and tube operator, DOT 239.687-014, SVP 2, unskilled, with approximately 1,300 jobs in the national economy. (Tr. 1029). The VE testified that this is a fairly exhaustive list of available jobs for this hypothetical individual. (Tr. 1032). Further, these jobs are not performed as described in the DOT. (*Id.*). The VE explained that an addresser is a full-time position that requires employees to put labels on envelopes. (Tr. 1033). She also stated that there had been an increase in tube operator jobs in places like laundromats, hospitals, airports, and stadiums. (*Id.*).

If that hypothetical individual were further limited to occasional reaching with the bilateral upper extremities in all directions, that limitation would eliminate all of the listed jobs and would eliminate all unskilled sedentary work. (Tr. 1029).

If the fourth hypothetical individual were instead limited to occasional handling and fingering bilaterally, that limitation would eliminate all of the listed jobs and would eliminate all light and sedentary work. (Tr. 1029-30).

If the fourth hypothetical individual were instead limited to occasionally required redirection or extra supervision to stay on task, the VE testified that limitation would be considered a workplace accommodation and would be appropriate during an introductory or probationary period from 30 to 90 days, but after that would be work preclusive. (Tr. 1030).

If the fourth hypothetical individual were instead further limited to occasional interaction with supervisors in a non-public work setting, but otherwise isolation – meaning no interaction or contact with supervisors – that limitation would be considered an accommodation, would not be considered competitive employment, and would be work preclusive. (*Id.*).

If the first or fourth hypothetical individual were limited to functioning in a very quiet environment up to one-third of the workday, that would be work preclusive. (Tr. 1034). If that limitation was altered to quiet, that individual could perform the addresser, tube operator, mail sorter, and routing clerk jobs. (*Id.*).

An employee working an unskilled job could be off task 14 percent of the workday in order to maintain employment. (Tr. 1030). Further, of the listed jobs for the hypothetical individuals, a person in those jobs could miss up to one day of work per month during an introductory or probationary period, up to one and a half days per month thereafter. (Tr. 1031).

14

Asked whether any of her testimony was outside the scope of or inconsistent with the DOT, the VE responded yes because the DOT's companion publications do not differentiate between climbing ladders, ropes, or scaffolds and ramps and stairs. (*Id.*). This is also true of the light limitation as given, variations in sitting, standing, and walking within exertion categories, time off task, absenteeism, working in isolation, need for redirection, extra supervision, non-public settings, superficial contact as defined, work environments with occasional changes in routine work setting that are equally explained and demonstrated in advance of implementation, nor production rate pace which as further defines. (*Id.*). Further, while they do address the nature of interaction with others, they do not address frequency. (Tr. 1031-32). The VE's testimony with regard to each of these limitations was based on her education, professional training, and experience as well as consultation with colleagues. (Tr. 1032).

Asked where the VE got her job numbers, she responded she used the DOT's numbers inside the SkillTRAN Job Browser Pro software. (Tr. 1033-34).

**IV.  The ALJ's Decision**

1.  The claimant has not engaged in substantial gainful activity since March 12, 2019, the application date (20 CFR 416.971 et seq.).

    The claimant has the following severe impairments: cervical degenerative disc disease/spondylosis/radiculopathy/torticollis [hereinafter, collectively, the "cervical impairment"], lumbar spondylosis, osteoarthritis/degenerative joint disease of the bilateral knees, carpal tunnel syndrome, generalized osteoarthritis, rheumatoid arthritis, fibromyalgia, migraine headaches, transient ischemic attack, diabetes mellitus, obesity, dysthymic disorder, adjustment disorder with mixed anxiety and depressed mood, and anxiety disorder. (20 CFR 416.920(c)).

2.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

3.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that the claimant may stand and/or walk, with normal breaks, for up to four hours in an eight-hour workday; the claimant may frequently push and/or pull with the bilateral upper extremities and may frequently operate foot controls with the bilateral lower extremities; the claimant never climb ladders, ropes or scaffolds, occasionally climb ramps and stairs, stoop, kneel, crouch and crawl, and frequently balance; the claimant may frequently reach, handle, and finger with the bilateral upper extremities; the claimant is able to work in very quiet, quiet, and moderate noise levels but may not be exposed, more than occasionally to vibration, extreme cold, or bright light [brighter than found in a typical office setting]; the claimant must avoid all exposure to unprotected heights, dangerous moving mechanical parts, and commercial driving; the claimant is limited to the performance of simple, routine repetitive tasks, conducted in a work setting free of high production-rate pace [as is found in assembly line work], which setting is non-public in character, and requires no more than occasional and superficial [defined as precluding group, tandem, or collaborative tasks, or tasks involving the management, direction, or persuasion of others] interaction with co-workers and supervisors, which setting is routine, in that it contemplates occasional changes, easily explained and/or demonstrated in advance of gradual implementation.

4.   The claimant is unable to perform any past relevant work (20 CFR 416.965).

5.   The claimant was born on July 26, 1975, and was 43 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

6.   The claimant has at least a high school education (20 CFR 416.964).

7.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

8.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20CFR 416.969 and 416.969a).

9.   The claimant has not been under a disability, as defined in the Social Security Act, since March 12, 2019, the date the application was filed (20 CFR 416.920(g)).

(Tr. 974-90).

16

## V.     Law & Analysis

### A.     Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1.     whether the claimant is engaged in substantial gainful activity;

2.     if not, whether the claimant has a severe impairment or combination of impairments;

3.     if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.     if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.     if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B.     Standard of Review[4]

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Substantial evidence is "'more than a scintilla of evidence but less than a preponderance.'" *Napier v. Comm'r of Soc. Sec.*, 127 F.4th 1000, 1004 (6th Cir. 2025) quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th

---

[4] The regulations governing DIB claims are found in 20 C.F.R. § 404, *et seq.* and the regulations governing SSI claims are found in 20 C.F.R. § 416, *et seq.*  Generally, these regulations are duplicates and establish the same analytical framework.  For ease of analysis, I will cite only to the relevant regulations in 20 C.F.R. § 404, *et seq.* unless there is a relevant difference in the regulations.

Cir. 2007). It means "'relevant evidence . . . a reasonable mind might accept as adequate to support a conclusion.'" *Id.* quoting *Biestek v. Berryhill*, 587 U.S. 97, 103, (2019). Even when an ALJ's decision is supported by substantial evidence, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-

13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 749 (6th Cir. 2007).

## VI.    Discussion

Oliver raises the following issue for this Court's review: "Whether the Administrative Law Judge's decision is supported by substantial evidence when he failed to properly analyze plaintiff's maximum RFC pursuant to SSR 19-4p and/or SSR 96-8p." (ECF Doc. 8, p. 1). Specifically, she argues that "the ALJ's analysis of her migraine headaches is not supported by substantial evidence . . . ." (ECF Doc. 8, p. 11). Regarding SSR 19-4p, Oliver asserts that the ALJ failed to properly consider the opinion of her treating neurologist, and that the finding that the ME's opinion was partially persuasive was not supported by substantial evidence. (*Id.* at pp. 11-12). As for SSR 96-8p, Oliver claims that the ALJ erred by failing to "address and discuss the main issue relative to equivalency – the frequency of [her] migraine headaches despite compliance with treatment – and her ability to sustain gainful employment . . . ." (*Id.* at p. 12).

In response, the Commissioner argues that Oliver "bears the burden of proving that she medically equaled a listing, and she did not meet her burden here." (ECF Doc. 10, p. 9). The Commissioner argues that pursuant to SSR 17-2p, the ALJ accurately found that Oliver did not meet or medically equal Listing 11.02 consistent with the finding of Dr. Lee, the ME. (*Id.* at p. 10). Further, the ALJ properly considered Oliver's migraines throughout the sequential analysis (*id.* at pp. 12-16) and substantial evidence supports the ALJ's decision (*id.* at pp. 16-17).

Because the issues are interrelated, I discuss them together and find that the ALJ's decision is not supported by substantial evidence.

At Step Three of the disability evaluation, a claimant is disabled if their impairment meets or equals one of the listings in the Listing of Impairments. *See* 20 C.F.R.

19

§ 404.1520(a)(4)(iii). "Each listing specifies 'the objective medical and other findings needed to satisfy the criteria of that listing.'" *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011), quoting 20 C.F.R. § 404.1525(c)(3). The claimant bears the burden to prove that their condition meets or equals a listing. *See* 20 C.F.R. § 404.1520(d); *Peterson v. Comm'r of Soc. Sec.*, 552 F. App'x 533, 539 (6th Cir. 2014), citing *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001). "A claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he satisfied a listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) quoting *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641-42. Rather, the claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004).

While there is no listing for headaches, SSR 19-4p provides guidance on how "primary headache disorders" such as migraines are established and evaluated, explaining: "While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that his or her MDI(s) medically equals the listing." SSR 19-4p. While a claimant cannot "meet" a listing for headache– as no such listing exists– their headaches could "medically equal" Listing 11.02 for epilepsy. *Id.* SSR 19-4p further addresses the application of Paragraph B of Listing 11.02 to headaches as follows:

> Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying

20

> symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

(*Id.*).

To meet her burden to show that an impairment medically equals a listing, Oliver must prove that "the findings related to [the] impairment(s) [were] at least of equal medical significance to those of a listed impairment." 20 C.F.R. § 404.1526(b)(2). Further, before an ALJ can find she medically equals a listing, the record "must" contain one of the following:

1.  A prior administrative medical finding from [a state agency medical consultant] or [psychological consultant] from the initial or reconsideration adjudication levels supporting the medical equivalence finding, or

2.  [Medical expert] evidence, which may include testimony or written responses to interrogatories, obtained at the hearings level supporting the medical equivalence finding, or

3.  A report from the [Appeals Council]'s medical support staff supporting the medical equivalence finding.

SSR 17-2p. Thus, an ALJ may only find medical equivalence at the hearing level if the record contains supportive medical opinion findings from either a state agency consultant or a medical expert. *Id.* And if the ALJ "believes the evidence does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment," SSR 17-2p provides that the ALJ need not obtain medical expert evidence, and in fact need not even "articulate specific evidence supporting his or her finding that the individual's impairment(s) does not medically equal a listed impairment." *Id.*

At Step Two, the ALJ found that Oliver's migraines were a severe impairment (Tr. 975), but found that impairment did not medically equal Listing 11.02 at Step Thee, explaining:

> Relevant to listing 11.02, the independent medical expert, Dr. Lee (36F), indicated that the claimant did not equal this listing. Per Social Security Ruling 19-4p, it is not programmatically possible to meet a non-existent listing. The opinion of Dr. Lee is consistent with the statement of the claimant's own treatment provider, that she has no medical findings and no limitations save during a severe migraine (15F).

(Tr. 976).

When determining the persuasiveness of Dr. Lee's opinion, the ALJ found as follows:

> The independent medical expert, Susan Lee, M.D., indicated, on May 17, 2023, that the claimant did not meet or equal any listing, particularly listing 11.02 [relevant to migraines], that the claimant could perform light work, could stand and/or walk for up to four hours in an eight-hour workday, in increments of no more than one hour, could never kneel, crouch, crawl, stoop, could occasionally push and/or pull, and could be exposed to no more than moderate noise levels. Dr. Lee had the opportunity to review the claimant's records and is reporting within the bounds of her professional certifications and specialty. However, by comparison to the overall evidence of record, described in digest form above in the analysis of the opinions of Drs. Prosperi and Lewis, the opinion overstates the claimant's postural and exertional [relevant to pushing and pulling] limitations to mild degree and understates, to significant degree, her environmental limitations. Still, this opinion remains partially consistent with, and supported by, the overall evidence of record and is only partially persuasive.

(Tr. 987).

Upon review, I agree with Oliver that the ALJ did not build an accurate and logical bridge between the evidence and the result, and the ALJ's decision making is therefore not supported by substantial evidence. While the ALJ did make a determination regarding the persuasiveness of Dr. Lee's opinion, in doing so he did not directly discuss or make a connection between the opinion and Oliver's migraines. Further, his determination that Oliver's statements regarding the frequency of her migraines was unfounded is not supported by substantial evidence.

Dr. Lee found, with respect to Listing 11.02B, that Oliver noted significant improvement in her migraines, which were reported controlled in 2020, and that while Oliver reported an increase in frequency in 2021, "[p]er the most recent Neurology notes in 2022, headaches were noted to be frequent, but no exact frequency was reported." (Tr. 1987).

In his opinion, the ALJ appears to address the issue of the frequency of Oliver's headaches. He finds that Oliver "has continued to describe frequent, if not daily headaches; however, there are multiple reviews of symptoms in the record, across the whole of the period relevant to this claim, within which she describes occasional headaches, or denies headaches (5F/2), (17F/218), (22F/8), (28F/79), (21F/3), (27F/86), (27F/2), (29F/7)." (Tr. 983).

Notwithstanding this assertion, a review of these records reveals that they do not all objectively stand for the proposition that Oliver denied headaches or endorsed occasional headaches. The ALJ's citation to 5F/2 (Tr. 584) reveals that at a 2019 pain management initial evaluation, Oliver reported occasional headaches. Citations 22F/8 (Tr. 1511), 28F/79 (Tr. 1829), and 21F/3 (Tr. 1367) reference a denial of pain while seeking treatment for other reasons. More specifically, in record 22F/8 (TR. 1511) Oliver does not expressly deny a headache at this encounter, rather she stated that symptoms of an acute episode of dysarthria, with numbness of the left face arm and leg had disappeared. In record 28F/79 (Tr. 1829), Oliver denied head pain during an encounter for a fall five days prior. Record 21F/3 (Tr. 1367) reveals that Oliver was negative for headaches during encounter for COVID-19 screening. However, citations 17F/218 (Tr.

926), 27F/86 (Tr. 1711-12), 27F/2 (Tr. 1627-28), and 29F/7[5] do not discuss headaches at all.

A review of the medical record reveals that Oliver reported to Dr. Brocker in 2018 that, at that time her migraines occurred six to seven times per week. (Tr. 387). She further reported the associated phenomena including nausea, vertigo, light flashes, and hallucinations; aggravating factors such as bright lights, stress, loud noise, and cold air; the duration of the migraines; and the alleviating factors such as sleep and medication. (*Id.*). Dr. Brocker's notes continue to discuss Oliver's medication adherence as she reported the effectiveness of various medications, before ultimately determining that Botox was the next step in September 2018. (*See e.g.*, Tr. 380, 383, 385, 377).

On this referral, Oliver began treating with Dr. Cassanova and receiving Botox injections for treatment of her migraines in early 2019. (Tr. 688). Over the course of her treatment between 2019 and 2023, records indicate that Oliver reported that the Botox injections originally provided 80 percent relief in February 2019 (*Id.*), dropping to 60 percent in December 2020 (Tr. 1530). While not every treatment note with Dr. Cassanova discusses the frequency of Oliver's migraines, she reported daily headaches in December 2020 (*Id.*) and January 2023 (Tr. 1979). Dr. Cassanova's treatment records also discuss the adjustments made to various medications for treatment and prevention of migraines. (*See e.g.*, Tr. 700, 1516, 1530, 1537). Dr. Cassanova found that Oliver's migraines were partially controlled with Botox injections on November 21, 2019. (Tr. 693).

---

[5] Oliver presented after falling down the stairs; there is a general notation that Oliver denied symptoms other than stated in the narrative portion of the record.

Where an ALJ's stated reasons for making a determination are inaccurate or based on a mischaracterization of the evidence, it has repeatedly been held that the ALJ failed to build an accurate and logical bridge between the evidence and the result. *See, e.g., Stemple v. Kijakazi*, No. 1:20-CV-485, 2021 WL 4060411, at *8 (N.D. Ohio Sept. 7, 2021) (inaccurate description of opinion's findings); *Morandy v. Comm'r of Soc. Sec.*, No. 2:19-CV-13464, 2021 WL 925227, at *5 (E.D. Mich. Feb. 22, 2021) (inaccurate description of opinion), *report and recommendation adopted*, 2021 WL 915540 (E.D. Mich. Mar. 10, 2021); *Muhammad v. Comm'r of Soc. Sec.*, No. 1:16-CV-2569, 2017 WL 4872668, at *9 (N.D. Ohio Oct. 10, 2017) (inaccurate reasons for discrediting medical findings), *report and recommendation adopted*, 2017 WL 4844042 (N.D. Ohio Oct. 26, 2017); *Moxley v. Comm'r of Soc. Sec.*, No. 1:15CV1533, 2016 WL 2338205, at *14 (N.D. Ohio Apr. 15, 2016) (inaccurate explanation for finding lack of credibility), *report and recommendation adopted*, 2016 WL 1733458 (N.D. Ohio Apr. 29, 2016).

While the ALJ's decision appears to discuss his evaluation of Oliver's reported frequency of her headaches, I find that this evaluation falls flat and mischaracterizes the facts. Many of the citations provided do not discuss headaches at all, while several others attempt to impute a correlation to headache frequency while Oliver was simply seeking treatment for other reasons. Due to the ALJ's mischaracterization of the medical evidence used to support his finding regarding the frequency of Oliver's migraines I find that the ALJ did not built an accurate and logical bridge between the evidence and the result.

Furthermore, while Dr. Lee is correct that there are encounters that do not indicate the frequency of Oliver's headaches, including what Dr. Lee describes as the "most recent" neurology note from 2022, the record also includes a neurology encounter from

25

January 2023 that does state that Oliver reported daily migraines. By failing to address or discuss this evidence, I cannot determine whether the ALJ discredited or merely overlooked it when determining the persuasiveness of Dr. Lee's opinion. *See Shrader*, No. 11-13000, 2012 WL 5383120, at *6. The ALJ thus did not build an accurate and logical bridge between the evidence in the record regarding Oliver's migraines and his decision. *See Fleischer*, 774 F. Supp. 2d at 877.

On this basis, I recommend that the case be remanded for further consideration of Oliver's migraines in relation to Listing 11.02, specifically with regard to frequency.

## VII.    Recommendation

Because the ALJ failed to apply proper legal standards, I recommend that the Commissioner's final decision denying Oliver's application for SSI be vacated and that Oliver's case be remanded for further consideration of her migraine headaches.

Dated: January 28, 2026

Reuben J. Sheperd
United States Magistrate Judge

---

## OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).